ORIGINAL

AO 93 (Rev. 12/09) Search and Seizure Warrant   (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) Case No.   **16-2518M** |
| One Dell Inspirion 15 Computer, serial number 9M57412; One Toshiba Satellite Laptop, serial number 3C134203R; One Toshiba Satellite Laptop with a broken screen, with an illegible serial number. | ) ) ) ) |

FILED

## SEARCH AND SEIZURE WARRANT

To:       Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Central_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.  Such affidavit(s) or testimony are incorporated herein by reference and attached hereto.

**YOU ARE COMMANDED** to execute this warrant on or before ___14 days from the date of its issuance___
*(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.       ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.
*(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐ for _____ days *(not to exceed 30)*.
☐ until, the facts justifying, the later specific date of _____

Date and time issued:   _12-22-16  2:35 pm_

Judge's signature

**Frederick F. Mumm**

City and state:   __Los Angeles, California__        U.S. Magistrate Judge
*Printed name and title*

AUSA: J. Mitchell (x10698)

JM

*AO 93  (Rev. 12/09) Search and Seizure Warrant (Page 2)*

| Return | | |
|---|---|---|
| Case No.:<br>16-2518 M | Date and time warrant executed:<br>12/23/16   1120 AM | Copy of warrant and inventory left with:<br>TFO LYDIA SAKAE. |

| Inventory made in the presence of :<br>SA LINDSAY EBERHARD - COOK |
|---|

Inventory of the property taken and name of any person(s) seized:

[Please provide a description that would be sufficient to demonstrate that the items seized fall within the items authorized to be seized pursuant to the warrant (e.g., type of documents, as opposed to "miscellaneous documents") as well as the approximate volume of any documents seized (e.g., number of boxes).  If reference is made to an attached description of property, specify the number of pages to the attachment and any case number appearing thereon.]

SEE ONE PAGE ATTACHMENT (FD-597 ; FILE NO. 305D-LA-6465641)
FOR ITEMS SEIZED.

**Certification**  (by officer present during the execution of the warrant)

I declare under penalty of perjury that I am an officer who executed this warrant and that this inventory is correct and was returned along with the original warrant to the designated judge through a filing with the Clerk's Office.

Date:  1|10| 17

_____
*Executing officer's signature*

TFO SAKAE , LYDIA
_____
*Printed name and title*

AUSA: J. Mitchell (x10698)

FD-597 (Rev 8-11-94)                                    Page __1__ of __1__

### UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
Receipt for Property Received/Returned/Released/Seized

File # 305D-LA-6465204

On (date) July 15, 2015

item(s) listed below were:
- [ ] Received From
- [ ] Returned To
- [ ] Released To
- [x] Seized

(Name) Faisal Mirza / Mohammad Mirza

(Street Address) 19445 Chatsworth St

(City) Northridge, CA 91326

Description of Item(s):

① Dell Inspiron 15 Service Tag # 9H57H2 with Power Cable ROOME
② Toshiba Laptop M/N: 3C134203R with Power Cable RANC
③ Toshiba Satellite Laptop, green light, SN not visible ROOM I

<u>Attachment A</u>

<u>PROPERTY TO BE SEARCHED</u>

The following digital devices (the "SUBJECT DIGITAL DEVICES"), seized on July 15, 2015 and currently maintained in the custody of the Federal Bureau of Investigation in Los Angeles, California:

     a.   One (1) Dell Inspirion 15 Computer, bearing serial number 9M57412;

     b.   One (1) Toshiba Satellite Laptop, bearing serial number 3C134203R; and

     c.   One (1) Toshiba Satellite Laptop with a broken screen, with an illegible serial number.

## ATTACHMENT B

## I. ITEMS TO BE SEARCHED

1.     The items to be searched are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Section 2252A(a)(2) (receipt and distribution of child pornography); and 2252(a)(5)(B) (possession of child pornography), namely:

a.     Child pornography, as defined in 18 U.S.C. § 2256(8).

b.     Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in 18 U.S.C. § 2256(8), including but not limited to, documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography.

c.     Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, tending to identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography, as defined in 18 U.S.C. § 2256(8).

Instrumentality Protocol

d.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2)(B).

e.    Any records, documents, programs, applications, or materials or items which are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct.  Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

f.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to peer-to-peer file-sharing software.

g.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to accounts with any Internet Service Provider.

h.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession of the SUBJECT PREMISES.

Instrumentality Protocol

i.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession and/or use of any digital device(s) found inside the SUBJECT PREMISES.

j.   Any digital device used to facilitate the above-listed violations and forensic copies thereof.

2.   With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

a.   Evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

b.   Evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.   Evidence of the attachment of other devices;

d.    Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.    Evidence of the times the device was used;

f.    Passwords, encryption keys, and other access devices that may be necessary to access the device;

g.    Applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

h.    Records of or information about Internet Protocol addresses used by the device;

i.    Records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

3.    As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

4.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing

data in digital form, including central processing units;

desktop, laptop, notebook, and tablet computers; personal

digital assistants; wireless communication devices, such as

telephone paging devices, beepers, mobile telephones, and smart

phones; digital cameras; peripheral input/output devices, such

as keyboards, printers, scanners, plotters, monitors, and drives

intended for removable media; related communications devices,

such as modems, routers, cables, and connections; storage media,

such as hard disk drives, floppy disks, memory cards, optical

disks, and magnetic tapes used to store digital data (excluding

analog tapes such as VHS); and security devices.

II.  SEARCH PROCEDURE FOR DIGITAL DEVICES

5.    In searching digital devices or forensic copies

thereof, law enforcement personnel executing this search warrant

will employ the following procedure:

a.    Law enforcement personnel or other individuals

assisting law enforcement personnel (the "search team") will, in

their discretion, either search the digital device(s) on-site or

seize and transport the device(s) to an appropriate law

enforcement laboratory or similar facility to be searched at

that location.

b.    The search team shall complete the search as soon

as is practicable but not to exceed 90 days from the date of

execution of the warrant.  If additional time is needed, the

government may seek an extension of this time period from the Court on or before the date by which the search was to have been completed.

      c.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

      i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

      ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

      iii.   The team searching the digital data also may use sophisticated tools, such as forensic hashing tools, to identify child pornography (including, but not limited to, "Encase" and "Forensic Tool Kit," or "FTK").  Forensic hashing is the process of using a mathematical function, often called an algorithm, to generate a numerical identifier for data (such as a particular file).  If the data is changed, even very

slightly (such as the addition or deletion of a comma or a period), the identifier should change.  A hash value can be thought of as a "digital fingerprint" for data.  The team searching digital devices in this case will also use a "hash set," which contains the hash values of image and video files associated with known identified victims of child pornography to determine whether these files are stored within a digital device.  Because this "hash set" is constantly being updated as investigations result in the rescue of children depicted in child pornography images/videos, it will not contain the hash values of all currently identified image and video files.  The team searching the digital devices will only use search protocols specifically selected to identify items to be seized under this warrant.

d.   When searching a digital device pursuant to the specific search protocols selected, the search team shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

e.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime

Instrumentality Protocol

was encountered, including how it was immediately apparent contraband or evidence of a crime.

f. If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

g. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access them (after the time for searching the device has expired) absent further court order.

i. The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an

Instrumentality Protocol

application for such an order is pending).  Otherwise, the government must return the device.

     j.   Notwithstanding the above, after the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

    6.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, Lydia Sakae, being duly sworn, declare and state as follows:

### I. INTRODUCTION

1.    I am a peace officer for the City of Los Angeles and have been so employed for over nine years.  I am currently a Task Force Officer ("TFO") with the Federal Bureau of Investigation ("FBI") and have been assigned to investigate the sexual exploitation of children and child pornography in the Central District of California as part of the Southern California Regional Sexual Assault Felony Enforcement ("SAFE") Team.  The SAFE Team is responsible for enforcing federal criminal statutes involving the sexual exploitation of children under Title 18, United States Code, Section 2251, et seq.  I have participated in several child pornography investigations and executions of search warrants concerning those offenders.  I have received approximately 20 hours of specialized training on cases involving sex crimes and the distribution of child pornography on the Internet.  Additionally, I have attended a Child Exploitation seminar, which focused on child predators and their Internet use of websites and applications.  Prior to being assigned as a TFO, I was an investigator with the Los Angeles Police Department ("LAPD"), Operation Valley Bureau ("OVB"), Registration Enforcement and Compliance Team ("REACT").  OVB REACT is responsible for sex registration and compliance enforcement, per California Penal Code section 290, of convicted

sex offenders who reside within the San Fernando Valley jurisdiction of LAPD.

2.    Through both my training and my experience, I have become familiar with the methods of operation used by people who commit offenses involving the sexual exploitation of children, and how people use the Internet to commit crimes arising from, and related to, the sexual exploitation of children.

## II.  PURPOSE OF AFFIDAVIT

3.    This affidavit is submitted in support of an application for a warrant to search three digital devices that are currently in the custody of the FBI (the "SUBJECT DIGITAL DEVICES") for evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 2252A(a)(2) (receipt and distribution of child pornography); and 2252(a)(5)(B) (possession of child pornography).

4.    The facts set forth in this affidavit are based on my personal observations, my training and experience, information obtained from various law enforcement personnel and witnesses, including FBI Special Agent's (SA), TFO's, analysts, and computer forensic professionals, written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement agents, information gathered from the service of administrative subpoenas, and information obtained from physical and electronic surveillance conducted by law enforcement agents.  This affidavit is intended to show merely that there is sufficient probable cause for the

requested warrant and does not purport to set forth all of my knowledge of, or investigation into, this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  ITEMS TO BE SEARCHED

5.    The items to be searched (the "SUBJECT DIGITAL DEVICES") are three digital devices (one computer tower, and two laptop computers) that were seized pursuant to a federal search warrant on or about July 15, 2015, from Faisal Mirza's residence, located at 18443 Chatsworth Street, Northridge, California 91326 (the "SUBJECT PREMISES").  The SUBJECT DIGITAL DEVICES are in possession of the FBI's Los Angeles Field Office, and are more particularly described as follows:

a.    One (1) Dell Inspirion 15 Computer, bearing serial number 9M57412;

b.    One (1) Toshiba Satellite Laptop, bearing serial number 3C134203R; and

c.    One (1) Toshiba Satellite Laptop with a broken screen, with an illegible serial number.

### IV.   PROBABLE CAUSE

6.    On or about July 10, 2015, Special Agent (SA) Tiana Kostic obtained a federal search warrant (Case No. 15-1290M) issued by the Honorable Jacqueline Chooljian, United States Magistrate Judge, authorizing the search of the property located at 18443 Chatsworth Street, Northridge, California 91326 (the

Instrumentality Protocol

"SUBJECT PREMISES"). The warrant is attached hereto as an exhibit and is incorporated as if fully set forth herein.

7. The search warrant was issued in response to an investigation into an online community of individuals who regularly sent and received child pornography via a website (hereinafter "Website A") that operated on an anonymous online network (hereinafter the "Network").[1] The investigation was initiated by FBI – Headquarters (HQ) and later reassigned to the FBI- Los Angeles Field Office's ("LAFO") SAFE TEAM due to the location of the SUBJECT INTERNET PROTOCOL (IP) ADDRESS.

8. In summary, the affidavit in support of the search warrant application in the attached exhibit explains that the investigation revealed that a user (known as "quadrupledomo"), operating from the SUBJECT IP ADDRESS assigned to the SUBJECT PREMISES, utilized an account, created on Website A to browse Website A, accessed and responded to posts containing links to images of child pornography. (See attached exhibit, affidavit pages 20-21)

---

[1]The actual names of Website A and the Network are known to law enforcement. However, the investigation into the users of Website A and the Network remains ongoing, and the disclosure of the names of Website A and the Network would potentially alert their members to the fact that law enforcement officers are investigating Website A and the Network. Public disclosure of that fact is likely to provoke members to notify other members of the investigation, flee, and/or destroy evidence. Accordingly, to preserve the confidentiality and integrity of the ongoing investigation, the actual names and other identifying details of Website A and the Network are not disclosed in this affidavit.

Instrumentality Protocol

9.   The original warrant and affidavit in support thereof, authorized the specific seizure of digital devices from the SUBJECT PREMISES, and the search of those devices for a period of 60 days to allow the government to attempt to obtain evidence of violations of Title 18, United States Code, Section 2252A(a)(2) (receipt and distribution of child pornography); and 2252(a)(5)(B) (possession of child pornography).

10.   On July 15, 2015, members of the FBI – SAFE Team executed the warrant at the SUBJECT PREMISES and seized the SUBJECT DIGITAL DEVICES.  During the search of the SUBJECT PREMISES, the SUBJECT DIGITAL DEVICES were seized, among other evidence.  Subsequent to the execution of the warrant, the occupants of the SUBJECT PREMISES were interviewed by SA Kostic and SA Rajiv Patel.  Faisal Mirza, a resident of the SUBJECT PREMISES, confessed to the interviewing agents that he possessed approximately 10 to 15 video files of possible child pornography, which he downloaded from website A utilizing the screen name "quadrupledomo."  Faisal Mirza stated that the video files contained images of females approximately 10 years of age. Faisal Mirza further admitted that the child pornography video files were stored on the SUBJECT DIGITAL DEVICES.

11.   The original warrant authorized a 60-day period for the government to conduct a search of the SUBJECT DIGITAL DEVICES, that is, until September 13, 2015.

12.   On or about July 28, 2015, SA Kostic sent an electronic request to the FBI-Computer Analysis Response Team ("FBI-CART") for a forensic examination of the SUBJECT DIGITAL

Instrumentality Protocol

DEVICES.  On July 31, 2015, the requested forensic examination
was assigned to a forensic examiner internally at CART.

13.  On August 8, 2015, the assigned forensic examiner
began the forensic copying of the SUBJECT DIGITAL DEVICES.  On
or about September 8, 2015, the forensic examiner advised that
the forensic reviewing process was ongoing.  SA Kostic,
subsequently, requested an extension of time to search the
SUBJECT DIGITAL DEVICES.

14.  On September 10, 2015, the Honorable Paul L. Abrams,
United States Magistrate Judge, signed an Order authorizing an
extension by which the government can retain and search the
seized SUBJECT DIGITAL DEVICES for 90 days, that is, until
December 9, 2015.

15.  After the extension was granted, the forensic examiner
made an exact copy of the data from the SUBJECT DIGITAL DEVICE.
An exact copy is made to allow the forensic examiner to process
the data contained within the SUBJECT DIGITAL DEVICE without
jeopardizing the original evidence.  Next, the forensic examiner
processed the extracted data, via a forensic examination
program, by compartmentalizing and segregating different types
of data (e.g., images, videos, documents, etc.).  The forensic
examiner then extracted the hash values (a unique identifying
alpha numeric sequence that is generated typically for images
and videos) from the extracted data.

16.  On October 14, 2015, the assigned forensic examiner
advised SA Kostic that she had processed the data extracted from
the SUBJECT DIGITAL DEVICES, and that the forensic copies of the

Instrumentality Protocol

SUBJECT DIGITAL DEVICES were ready to be reviewed.  The forensic examiner then uploaded the forensically copied data from the SUBJECT DIGITAL DEVICES into a forensic examination program, and was made ready to be reviewed.  The forensic examiner further advised that the forensically copied data from the SUBJECT DIGITAL DEVICES totaled approximately 1 terabyte (1,000 gigabytes).

17.  On December 22, 2016, SA Kostic requested the data extracted from the SUBJECT DIGITAL DEVICES be processed via a newly developed forensic examination program.  Due to technological advancements, forensic examination processes are being continuously updated and improved forensic examination programs are continuously developed and updated.  For example, one forensic examination program may be able to detect/read files that another forensic examination program may not be able to detect/read.  By uploading the forensically copied data into various forensic examination programs, it allows the investigator to extensively review the evidence and exhaust all means available to him/her to thoroughly search seized devices. The upload of the forensically copied data into the newly developed forensic examination program was completed on January 26, 2016.  As of January 26, 2016, the SUBJECT DIGITAL DEVICES have not been accessed nor have the forensic copies of the SUBJECT DIGITAL DEVICES been reviewed since that time.

18.  On or about June 27, 2016, SA Kostic was reassigned to the White Collar Crime section, Health Care Fraud (WCC3).

Instrumentality Protocol

19.   On or about September 21, 2016, I was assigned to complete the search of the SUBJECT DIGITAL DEVICES.

20.   On or about September 27, 2016, SA Kostic advised me that she did not review the SUBJECT DIGITAL DEVICES.

21.   This means the following remains to be completed: (1) a review of the forensic examinations of the SUBJECT DIGITAL DEVICES and (2) generating a forensic report which documents the review of the SUBJECT DIGITAL DEVICES.   Based on the number of SUBJECT DIGITAL DEVICES and the anticipated amount of data (i.e. 1 terabyte) that I will need to examine, I anticipate that this will require a time period of approximately 90 additional days to accomplish.

## V. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

22.   Based on my knowledge, training, and experience as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that it is not always possible to search digital devices for digital data in a single day or even over several weeks for a number of reasons, including the following:

a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.   There are many types of digital devices and software in use today that it takes time to conduct a thorough search.   In addition, it may also be necessary to consult with specially trained personnel who have specific

Instrumentality Protocol

expertise in the type of digital device, software application or operating system that is being searched.

    b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden", erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

    c.    The volume of data stored on many digital devices will typically be so large that it takes substantial time to search such devices properly. A single gigabyte could hold the contents of about ten yards of books on a shelf. One hundred gigabytes could hold an entire library floor of academic journals. The SUBJECT DEVICES contain approximately 1 terabyte (1,000 gigabytes) of data. (i.e. 10 library floors of academic journals)

    d.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not

Instrumentality Protocol

actually disappear; rather, that data remains on the hard drive
until it is overwritten by new data.  Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space, i.e., space on the hard drive that is not allocated to an
active file or that is unused after a file had been allocated to
a set block of storage space for long periods of time before
they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file.  Similarly, files that have been viewed via the
Internet are automatically downloaded into a temporary Internet
directory or cache.  The browser typically maintains a fixed
amount of hard drive space devoted to these files, and the files
are only overwritten as they are replaced with more recently
viewed Internet pages.  Thus, the ability to retrieve residue of
an electronic file from a hard drive depends less on when the
file was downloaded or viewed than on a particular user's
operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive
requires specialized tools and a controlled laboratory
environment.  Recovery also can require substantial time.

     e.    Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such a word processor, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.
In particular, records of how a digital device has been used,
what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents,

programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can required substantial time.

f.   Further, evidence of how a digital device has been used, what it has been for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not

responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

g.   Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort

through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

      h.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI.  CONCLUSION

23.  Based on the foregoing, I respectfully submit that there is probable cause to believe that the following SUBJECT DIGITAL DEVICES contain evidence of violations of Title 18, United States Code, Section 2252A(a)(2) (receipt and distribution of child pornography); and 2252(a)(5)(B) (possession of child pornography).

24.  I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on December 22, 2016, at Los Angeles, California.

Lydia Sakae,
Task Force Officer
Federal Bureau of
Investigation

Subscribed to and sworn before me this 22nd day of December, 2016.

HONORABLE      Frederick F. Mumm
UNITED STATES MAGISTRATE JUDGE

Instrumentality Protocol

# EXHIBIT

AO 106 (Rev. 04/10) Application for a Search Warrant (USAO CDCA Rev. 01/2013)



# UNITED STATES DISTRICT COURT
### for the
Central District of California

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
18443 Chatsworth Street, Northridge, California 91326

)
)
)
)
)
)

Case No.   **15-1290M**

**JUL 10 2015**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ Central _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 2252A(a)(5)(B) (access with intent to view and possession of child pornography) | See attached Affidavit |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/

*Applicant's signature*

FBI Special Agent Tiana Kostic
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7/10/15

**JACQUELINE CHOOLJIAN**

*Judge's signature*

City and state:  Los Angeles, California

Hon. Jacqueline Chooljian, U.S. Magistrate Judge
*Printed name and title*

AUSA:  Wilson Park x5796

WP

## ATTACHMENT A

## PREMISES TO BE SEARCHED

The premises to be searched (the "SUBJECT PREMISES") is the premises located at 18443 Chatsworth Street, Northridge, California 91326.  The SUBJECT PREMISES is a one-story single family home located on the north side of Chatsworth Street.  The SUBJECT PREMISES has an exterior of pink stucco with white trim and a light grey roof.  The number "18443" is painted in black on the curb in front of the SUBJECT PREMISES.  Hedges and a black metal fence surround the perimeter of the SUBJECT PREMISES.  The SUBJECT PREMISES includes any parking spaces, garages, storage space, and appurtenances that are associated with the property located at 18443 Chatsworth Street, Northridge, California 91326.

Instrumentality Protocol

**ATTACHMENT B**

**I.**   **ITEMS TO BE SEIZED**

1.      The items to be seized are evidence, fruits, and instrumentalities of violations of

18 U.S.C. § 2252A(a)(5)(B) (access with intent to view and possession of child pornography),

specifically:

a.      Child pornography, as defined in 18 U.S.C. § 2256(8).

b.      Any records, documents, programs, applications, or materials, including

electronic mail and electronic messages, that refer to child pornography, as defined in 18 U.S.C.

§ 2256(8), including but not limited to documents that refer to the possession, receipt,

distribution, transmission, reproduction, viewing, sharing, purchase, downloading, production,

shipment, order, requesting, trade, or transaction of any kind, involving child pornography.

c.      Any records, documents, programs, applications, or materials, including

electronic mail and electronic messages, tending to identify persons involved in the possession,

receipt, distribution, transmission, reproduction, viewing, sharing, purchase, downloading,

production, shipment, order, requesting, trade, or transaction of any kind, involving child

pornography, as defined in 18 U.S.C. § 2256.

d.      Any records, documents, programs, applications, or materials, including

electronic mail and electronic messages, that identify any minor visually depicted while engaging

in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

e.      Any and all records, documents, programs, applications, or materials or

items which are sexually arousing to individuals who are interested in minors, but which are not

in and of themselves obscene or which do not necessarily depict minors involved in sexually

Instrumentality Protocol

explicit conduct. Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

        f.     Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to Website A and the Network.

        g.     Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to accounts with any Internet Service Provider.

        h.     Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession of 18443 Chatsworth Street, Northridge, California 91326 (the "SUBJECT PREMISES"), as defined in Attachment A.

        i.     Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession and/or use of any digital device(s) found inside the SUBJECT PREMISES.

        j.     Any digital device used to facilitate the above-listed violations and forensic copies thereof.

        k.     With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

                                          Instrumentality Protocol

      i.       evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

      ii.      evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      iii.      evidence of the attachment of other devices;

      iv.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

      v.      evidence of the times the device was used;

      vi.      passwords, encryption keys, and other access devices that may be necessary to access the device;

      vii.      applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

      viii.      records of or information about Internet Protocol addresses used by the device;

      ix.      records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web

Instrumentality Protocol

pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.      As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.      As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.   **SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.      In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.      Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is

Instrumentality Protocol

practicable but not to exceed 60 days from the date of execution of the warrant. If additional time is needed, the government may seek an extension of this time period from the Court on or before the date by which the search was to have been completed.

        b.      The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

        i.      The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

        ii.      The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii.      The team searching the digital data also may use sophisticated tools, such as forensic hashing tools, to identify child pornography (including, but not limited to, "Encase" and "Forensic Tool Kit," or "FTK"). Forensic hashing is the process of using a mathematical function, often called an algorithm, to generate a numerical identifier for data (such as a particular file). If the data is changed, even very slightly (such as the addition or deletion of a comma or a period), the identifier should change. A hash value can be thought of as a "digital fingerprint" for data. The team searching digital devices in this case will also use a "hash set," which contains the hash values of image and video files associated with known identified victims of child pornography to determine whether these files are stored within digital devices. Because

Instrumentality Protocol

this "hash set" is constantly being updated as investigations result in the rescue of children

depicted in child pornography images/videos, it will not contain the hash values of all currently

identified image and video files. The team searching the digital devices will only use search

protocols specifically selected to identify items to be seized under this warrant.

   c.  When searching a digital device pursuant to the specific search protocols

selected, the search team shall make and retain notes regarding how the search was conducted

pursuant to the selected protocols.

   d.  If the search team, while searching a digital device, encounters

immediately apparent contraband or other evidence of a crime outside the scope of the items to

be seized, the team shall immediately discontinue its search of that device pending further order

of the Court and shall make and retain notes detailing how the contraband or other evidence of a

crime was encountered, including how it was immediately apparent contraband or evidence of a

crime.

   e.  If the search determines that a digital device does not contain any data

falling within the list of items to be seized, the government will, as soon as is practicable, return

the device and delete or destroy all forensic copies thereof.

   f.  If the search determines that a digital device does contain data falling

within the list of items to be seized, the government may make and retain copies of such data,

and may access such data at any time.

   g.  If the search determines that a digital device is (1) itself an item to be

seized and/or (2) contains data falling within the list of items to be seized, the government may

`Instrumentality Protocol`

retain forensic copies of the digital device but may not access them (after the time for searching the device has expired) absent further court order.

       h.    The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending).  Otherwise, the government must return the device.

       i.    Notwithstanding the above, after the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

    5.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

       a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

       b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

       c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

       d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

                                           Instrumentality Protocol

e.      Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.      Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.      Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.      The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

Instrumentality Protocol

### AFFIDAVIT

I, Tiana Kostic, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.      I have been employed as a Special Agent ("SA") of the Federal Bureau of
Investigation ("FBI") for approximately 10 months.  During my employment as a SA, I have
received 21 weeks of formal education at the FBI Academy, which included instruction in
writing affidavits and providing evidentiary testimony.  I have also received training in the
investigation and prosecution of child pornography and child exploitation offenses, and I have
had the opportunity to observe and review numerous examples of child pornography (as defined
in 18 U.S.C. § 2256) in many forms of media, including computer media.  I currently investigate
crimes involving the sexual exploitation of children and child pornography in the Central District
of California and am a member of the Southern California Regional Sexual Assault Felony
Enforcement ("SAFE") Team.  The SAFE Team is responsible for enforcing federal criminal
statutes involving the sexual exploitation of children under 18 U.S.C. § 2251, et seq.  Before my
employment with the FBI, I worked as a certified forensic psychophysiologist, where I
administered polygraph examinations to a variety of convicted sexual offenders.

2.      Through my training and experience, I have become familiar with the methods
used by people who commit offenses involving the sexual exploitation of children.  My training
and experience has given me an understanding of how people who commit offenses relating to
the sexual exploitation of children use the Internet to facilitate and commit those offenses.

///

///

Instrumentality Protocol

## II.  PURPOSE OF AFFIDAVIT

3.      This affidavit is made in support of an application for a warrant to search the premises located at 18443 Chatsworth Street, Northridge, California 91326 (the "SUBJECT PREMISES"), more fully described below and in Attachment A, which is attached hereto and incorporated herein by reference, and to seize evidence, fruits, and instrumentalities, as specified in Attachment B, which is also attached hereto and incorporated by reference, of violations of 18 U.S.C. § 2252A(a)(5)(B) (access with intent to view and possession of child pornography).

4.      The facts set forth in this affidavit are based on my personal observations, my training and experience, information obtained from various law enforcement personnel and witnesses, including FBI SAs, analysts, and computer forensic professionals, written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement agents, information gathered from the service of administrative subpoenas, and information obtained from physical and electronic surveillance conducted by law enforcement agents. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III.  PREMISES TO BE SEARCHED AND ITEMS TO BE SEIZED

5.      The premises to be searched (the "SUBJECT PREMISES") is the premises located at 18443 Chatsworth Street, Northridge, California 91326. The SUBJECT PREMISES is a one-story single family home located on the north side of Chatsworth Street. The SUBJECT PREMISES has an exterior of pink stucco with white trim and a light grey roof. The number

2

Instrumentality Protocol

"18443" is painted in black on the curb in front of the SUBJECT PREMISES. Hedges and a black metal fence surround the perimeter of the SUBJECT PREMISES. The SUBJECT PREMISES includes any parking spaces, garages, storage space, and appurtenances that are associated with the property located at 18443 Chatsworth Street, Northridge, California 91326.

6.     The items to be seized are described in Attachment B, which is attached hereto and incorporated herein by reference.

## IV. DEFINITIONS

7.     The following terms, as used in this affidavit, have the following meanings:

a.     "Minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in 18 U.S.C. § 2256.

b.     "Child Erotica" means materials or items that are sexually arousing to persons who have a sexual interest in minors, but that are not, in and of themselves, legally obscene, or do not necessarily depict minors in sexually explicit conduct.

c.     "Computer" is defined pursuant to 18 U.S.C. § 1030(e)(1) as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

d.     "Computer Server" or "Server" is a computer that is attached to a dedicated network and serves many users. A web server, for example, is a computer which hosts the data associated with a website. That web server receives requests from a user and delivers information from the server to the user's computer via the Internet. A domain name system ("DNS") server, in essence, is a computer on the Internet that routes communications

3

Instrumentality Protocol

when a user types a domain name, such as www.cnn.com, into his or her web browser.
Essentially, the domain name must be translated into an Internet Protocol address so the
computer hosting the website may be located, and the DNS server provides this function.

      e.     "Computer software" or "software" is digital information which can be
interpreted by a computer or any of its related components to direct the way they work.
Computer software is stored in electronic, magnetic, or other digital form.  It commonly
includes programs to run operating systems, applications, and utilities.

      f.     "Host Name" is a name assigned to a device connected to a computer
network that is used to identify the device in various forms of electronic communication, such
as communications over the Internet.

      g.     "File Transfer Protocol" ("FTP") is a standard network protocol used to
transfer computer files from one host to another over a computer network, such as the Internet.
FTP is built on client-server architecture and uses separate control and data connections between
the client and the server.

      h.     Media Access Control ("MAC") address:  The equipment that connects a
computer to a network is commonly referred to as a network adapter.  Most network adapters
have a MAC address assigned by the manufacturer of the adapter that is designed to be a unique
identifying number.  A unique MAC address allows for proper routing of communications on a
network.  Because the MAC address does not change and is intended to be unique, a MAC
address can allow law enforcement to identify whether communications sent or received at
different times are associated with the same adapter.

4

Instrumentality Protocol

i.      "Internet" is defined as the worldwide network of computers -- a noncommercial, self-governing network devoted mostly to communication and research with roughly 500 million users worldwide.  The Internet is not an online service and has no real central hub.  It is a collection of tens of thousands of computer networks, online services, and single user components.  In order to access the Internet, an individual computer user must use an access provider, such as a university, employer, or commercial Internet Service Provider, which operates a host computer with direct access to the Internet.

j.      "Internet Service Providers" ("ISPs") are commercial organizations that are in business to provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including telephone based dial-up, broadband based access via digital subscriber line ("DSL") or cable television, dedicated circuits, or satellite based subscription.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name (a user name or screen name), an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.  By using a computer equipped with a modem, the subscriber can establish communication with the ISP over a telephone line, through a cable system or via satellite, and can access the Internet by using his or her account name and personal password.

k.      "Internet Protocol Address" or "IP address" refers to a unique number used by a computer to access the Internet.  IP addresses can be "dynamic," meaning that the ISP

5

Instrumentality Protocol

assigns a different unique number to a computer every time it accesses the Internet. IP addresses can also be "static," if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet. IP addresses are also used by computer servers, including web servers, to communicate with other computers.

       l.    A "website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language ("HTML") and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol ("HTTP").

       m.    "Hyperlink" refers to an item on a webpage which, when selected, transfers the user directly to another location in a hypertext document or to some other webpage.

       n.    "Bulletin Board" means an Internet-based website that is either secured (accessible only with a password) or unsecured, and provides members with the ability to view postings by other members and make postings themselves. Postings can contain text messages, still images, video images, or web addresses that direct other members to specific content. Bulletin boards are also referred to as "Internet forums" or "message boards." A "post" or "posting" is a single message posted by a user. Users of a bulletin board may post messages in reply to a post. A message "thread," often called a "topic," refers to a linked series of posts and reply messages. Message threads or topics often contain a title, which is generally selected by the user who posted the first message of the thread. Bulletin boards often also provide the ability for members to communicate on a one-to-one basis through "private messages." Private messages are similar to e-mail messages that are sent between two members of a bulletin board.

6

                                                `Instrumentality Protocol`

They are accessible only by the users who sent and received such messages, or by the bulletin board's administrator.

> o.   "Chat" means any kind of communication over the Internet that consists of the real-time transmission of messages between two users.  Chat messages enable participants to respond quickly to one another and in a format that is similar to an oral conversation.  This feature distinguishes chatting from other text-based online communications such as Internet forums and e-mail.

## V.   BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY

8.   Based on my training and experience, and the training and experience of other law enforcement officers experienced in investigating crimes involving the sexual exploitation of children with whom I have had discussions, I know the following:

> a.   Computers and digital technology have dramatically changed the way in which individuals interested in child pornography interact with each other.  Computers basically serve four functions in connection with child pornography:  production, communication, distribution, and storage.

> b.   Individuals with an interest in child pornography can now transfer printed photographs into a computer-readable format with a device known as a scanner.  Furthermore, with the advent of digital cameras, when a photograph is taken, it is saved as a digital file that can be directly transferred to a computer by simply connecting the camera to the computer.  In the last ten years, the resolution of pictures taken by digital cameras has increased dramatically, meaning the photos taken with digital cameras have become sharper and crisper.  Photos taken on a digital camera can be stored on a removable memory card in the camera.  These memory

Instrumentality Protocol

cards often store up to 32 gigabytes of data, which provides enough space to store thousands of high-resolution photographs. Video camcorders, which once recorded video onto tapes or mini-CDs, now can save video footage in a digital format directly to a hard drive on the camera. The video files can then be easily transferred from the camcorder to a computer.

      c.    A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world. The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the methods of distributing and receiving child pornography. Child pornography can be transferred via electronic mail or through FTPs to anyone with access to a computer and modem. Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., Instant Messaging), and easy access to the Internet, the computer is a preferred method for distributing and receiving child pornography.

      d.    The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution. In addition, there are numerous options available for the storage of computer or digital files. One-Terabyte external and internal hard drives are not uncommon. Other media storage devices include CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices which are plugged into a port on the computer. It is extremely easy for an individual to take a

8

Instrumentality Protocol

photo with a digital camera, upload that photo to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices (CDs and DVDs are unique in that special software must be used to save or "burn" files onto them). Media storage devices can easily be concealed and carried on an individual's person.

      e.     The Internet affords individuals many different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

      f.     Individuals can also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services, as well as electronic storage of computer files in a variety of formats. A user can set up an online storage account from any computer with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer or external media in most cases.

      g.     As is the case with most digital technology, communications via a computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

9

Instrumentality Protocol

## VI.  PROBABLE CAUSE

A.   SUMMARY OF PROBABLE CAUSE

9.     As set forth in greater detail below, an individual using IP address 104.34.111.20 (the "SUSPECT IP ADDRESS") has been linked to an online community of individuals who regularly sent and received child pornography via a website ("Website A") that operated on an anonymous online network (the "Network").[1]  Specifically, there is probable cause to believe that an individual using the SUSPECT IP ADDRESS knowingly accessed child pornography with the intent to view it on Website A in February 2015.  Further investigation has revealed that at the time the child pornography was accessed, the SUSPECT IP ADDRESS was assigned to the SUBJECT PREMISES.

B.   BACKGROUND REGARDING THE NETWORK

10.     On or about May 22, 2015, I reviewed a report provided by the Violent Crimes Against Children ("VCAC") Section (the "VCAC Report") of the Major Case Coordination Unit of the FBI.  VCAC is a group based in Maryland that collects leads from multiple sources and conducts initial investigations into crimes against children, before the investigations are referred to FBI field offices across the country.  Based on my training and experience, my review of the

---

[1] The actual names of Website A and the Network are known to law enforcement. However, the investigation into the users of Website A and the Network remains ongoing, and the disclosure of the names of Website A and the Network would potentially alert their members to the fact that law enforcement officers are investigating Website A and the Network.  Public disclosure of that fact is likely to provoke members to notify other members of the investigation, flee, and/or destroy evidence.  Accordingly, to preserve the confidentiality and integrity of the ongoing investigation, the actual names and other identifying details of Website A and the Network are not disclosed in this affidavit.

10

Instrumentality Protocol

VCAC Report, and information related to me by other FBI SAs involved in the investigation, I know the following:

      a.      Website A operated on the Network, which is a network that is available to Internet users who are aware of its existence. The Network is designed specifically to facilitate anonymous communication over the Internet. In order to access the Network, a user must install computer software that is publicly available, either by downloading software to the user's existing web browser, downloading free software available from the Network's administrators, or downloading a publicly-available third-party application.[2] By using the Network, a user can prevent others attempting to monitor the user's Internet connection from learning what websites a user visits. The user can also prevent the websites the user visits from learning the user's physical location. Because of the way the Network routes communication through other computers, traditional IP identification techniques are not viable.

      b.      Websites that are accessible only to users within the Network can be set up on the Network. Website A is no longer active, but it was was one such website when it was active. As such, Website A could not generally be accessed through the traditional Internet.[3] Only a user who had installed the appropriate software on the user's computer could have accessed Website A. Even after connecting to the Network, a user had to know the exact web address of Website

---

    [2] Users may also access the Network through "gateways" on the open Internet. However, these gateways do not provide users with the full anonymizing benefits of the Network.

    [3] Due to a misconfiguration, prior to February 20, 2015, Website A was occasionally accessible through the traditional Internet. However, in order to have accessed Website A in that manner, a user would have needed to know the exact IP address of the computer server that hosted Website A, which was not publicly available information. As of approximately February 20, 2015, Website A was no longer accessible through the traditional Internet.

Instrumentality Protocol

A in order to access it.  Further, websites on the Network are not indexed in the same way as websites on the traditional Internet.  Unlike on the traditional Internet, a user could not have simply performed a Google search for the name of Website A, obtained the web address for Website A, and clicked on a link to navigate to Website A.  Rather, a user would have had to obtain the web address for Website A directly from another source, such as other users of Website A, or from online postings describing both the sort of content available on Website A and its location.  Accessing Website A therefore required numerous affirmative steps by a user, making it extremely unlikely that any user could have simply stumbled upon Website A without first understanding its content and knowing that its primary purpose was to advertise and distribute child pornography.

        c.      The Network's software protects users' privacy online by bouncing their communications around a distributed network of relay computers run by volunteers all around the world, thereby masking the users' actual IP addresses, which could otherwise be used to identify the users.

        d.      The Network also makes it possible for users to hide their locations while offering various kinds of services, such as web publishing, forum/website hosting, and the provision of instant messaging.  Within the Network itself, entire websites can be set up which operate in the same manner as regular public websites, with one critical exception -- the IP address for the web server is hidden and is replaced with a Network-based web address.  A user can only reach such sites if the user is using the Network client and operating in the Network.  Because neither a user nor law enforcement can identify the actual IP address of the web server, it is not possible to determine through public lookups where the computer that hosts the website

12

Instrumentality Protocol

is located. Accordingly, it is not possible to obtain data detailing the activities of the users from the website server through public lookups.

C.    BACKGROUND REGARDING WEBSITE A

11.    Based on my training and experience, my review of the VCAC Report, and information related to me by other FBI SAs involved in the investigation, I know the following:

a.    Website A was a child pornography bulletin board and website dedicated to the advertisement and distribution of child pornography and the discussion of matters pertinent to the sexual abuse of children, including the need to protect from law enforcement individuals who seek to sexually exploit children online. On or about February 20, 2015, the computer server hosting Website A was seized from a web-hosting facility in North Carolina. The website, however, continued to operate in Virginia from February 20, 2015, until March 4, 2015, at which time Website A ceased to operate. Between February 20, 2015, and March 4, 2015, law enforcement agents acting pursuant to an order of the United States District Court for the Eastern District of Virginia monitored electronic communications of users of Website A. Before, during, and after its seizure by law enforcement, law enforcement agents viewed, examined, and documented the contents of Website A, which are described below.

b.    According to statistics posted on the site, Website A contained a total of 117,773 posts, 10,622 total topics, and 214,898 total members as of March 4, 2015. The website appeared to have been operating since approximately August 2014, which is when the first post was made on the message board. On the main page of the site, located to either side of the site name, were two images depicting what appeared to be partially clothed prepubescent girls with their legs spread, accompanied by text stating: "No cross-board reposts, .7z preferred, encrypt

13

Instrumentality Protocol

filenames, include preview, Peace out." Based on my training and experience, I know that the phrase "No cross-board reposts" refers to a prohibition against material that is posted on other websites from being "re-posted" to Website A. I also know based on my training and experience that the term ".7z" refers to a preferred method of compressing large files, such as videos, or sets of files for distribution. To the right of the website's name, there are two data-entry fields with a corresponding "Login" button. Located below the aforementioned items was the message: "Warning! Only registered members are allowed to access the section. Please login below or 'register an account' [(a hyperlink to the registration page)] with [Website A]." Below this message was the "Login" section, consisting of four data-entry fields with the corresponding text, "Username, Password, Minutes to stay logged in, and Always stay logged in."

      c.    Upon accessing the "register an account" hyperlink, a user would see a message that informed him or her that the forum required new users to enter an e-mail address that appeared valid. However, the message instructed members not to enter a real e-mail address. The message further stated that once a user registered (by selecting a user name and password), the user would be able to fill out a detailed profile. The message went on to warn the user: "[F]or your security you should not post information here that can be used to identify you." The message further detailed rules for the forum and provided other recommendations on how to hide the user's identity for the user's own security.

      d.    After accepting the above terms, a user was required to enter a username, password, and e-mail account in order to register to the message board, although a valid e-mail account was not required as described above.

14

Instrumentality Protocol

e.      After successfully registering and logging into Website A, the user could access any number of sections, forums, and sub-forums. Some of the sections, forums, and sub-forums available to users included: (a) How to; (b) General Discussion; (c) [Website A] information and rules; and (d) Security & Technology discussion. Additional sections, forums, and sub-forums included: (a) Jailbait – Boy; (b) Jailbait – Girl; (c) Preteen – Boy; (d) Preteen – Girl; (e) Pre-teen Videos – Girl HC; (f) Pre-teen Videos – Boys HC; (g) Toddlers; and (h) Kinky Fetish – Scat. Based on my training and experience, I know that "jailbait" refers to underage but post-pubescent minors; "HC" means hardcore (i.e., depictions of sexually explicit conduct that involve sexual penetration); and "scat" refers to the use of feces in various sexual acts. There was also an additional section and forum where members could exchange usernames on a Network-based instant messaging service that I know, based upon my training and experience, to be commonly used by subjects engaged in the online sexual exploitation of children.

f.      I have reviewed the various topics within the above forums, and I saw that each topic contained a title, the author, the number of replies, the number of views, and the last post. The "last post" section of a particular topic included the date and time of the most recent posting to that thread as well as the author. Upon accessing a topic, the original post appeared at the top of the page, with any corresponding replies to the original post included in the post thread below it. Typical posts appeared to contain text, images, thumbnail-sized previews of images, compressed files (such as Roshal Archive files, commonly referred to as ".rar" files, which are used to store and distribute multiple files within a single file), links to external sites, or replies to previous posts.

15

Instrumentality Protocol

g.     I have reviewed the various topics within the "[Website A] information and rules," "How to," "General Discussion," and "Security & Technology discussion" forums, and I saw that the majority contained general information about the website, instructions and rules for how to post, and welcome messages between users.

h.     FBI SAs with VCAC have reviewed the topics within the remaining forums and have seen that the majority contained discussions about, and numerous images that appeared to depict, child pornography and child erotica depicting prepubescent girls, boys, and toddlers. For example:

i.     On September 16, 2014, a user posted a topic entitled "9yo Niece - Horse.mpg" in the "Pre-teen Videos - Girls HC" forum that contained four images depicting what appeared to be a prepubescent girl, as well as a hyperlink to an external website that contained a video file depicting what appeared to be the same girl. Among other things, the video depicted the girl, who was naked from the waist down with her vagina and anus exposed, lying or sitting on top of a naked adult male, whose penis was penetrating the girl's anus.

ii.     On January 30, 2015, a user posted a topic entitled "Sammy" in the forum "Pre-teen – Photos – Girls" that contained hundreds of images depicting what appeared to be a prepubescent girl. One of these images depicted the girl being orally penetrated by the penis of an adult male.

iii.     On February 3, 2015, a user posted a topic entitled "Buratino-06" in the forum "Pre-teen – Videos – Girls HC" that contained numerous images depicting what appeared to be a prepubescent or early pubescent girl. One of these images depicted the girl being orally penetrated by the penis of a naked adult male.

16

Instrumentality Protocol

i.      Website A also had a list of members, accessible after registering for an account, which revealed that approximately 100 users made at least 100 posts to one or more of the forums.  Approximately 31 of these users made at least 300 posts.  In total, Website A contained thousands of postings and messages containing child pornography images.  Those images included depictions of what appeared to be nude prepubescent minors lasciviously exposing their genitals or engaged in sexually explicit conduct with adults or other children.

j.      Website A also included a feature referred to as "[Website A] Image Hosting."  This feature of Website A allowed users to upload links to images of child pornography, which were then accessible to all registered users of Website A.  On February 12, 2015, a FBI SA accessed a post on Website A titled "Giselita," which was created by a particular Website A user.  The post contained links to images stored on "[Website A] Image Hosting."  The images depicted what appeared to be a prepubescent girl in various states of undress.  Some images were focused on the nude genitals of the prepubescent girl, while others depicted an adult male's penis partially penetrating the girl's vagina.

k.      Website A further included a section that provided forums for the discussion of methods and tactics to perpetrate child sexual abuse.  For example:

i.      On January 8, 2015, a user posted a topic entitled "should i proceed?" in the forum "Stories - Non-Fiction" that contained a detailed accounting of an alleged encounter between the user and a 5-year-old girl.  The user wrote: "it felt amazing feeling her hand touch my dick even if it was through blankets and my pajama bottoms . . . ."  The user further stated that the girl "seemed really interested and was smiling a lot when she felt my cock" and ended his post with the question, "should I try to proceed?"  A different user replied to the post and

17

Instrumentality Protocol

stated: "let her see the bulge or even let her feel you up . . . you don't know how she might react, at this stage it has to be very playful . . . ."

1.      Because of the structure of Website A and the Network, it is possible for users to access and view images of child pornography without actually downloading the images of child pornography to their own computers or digital devices.  However, as set forth below in detail, I know from my training and experience, and the training and experience of other law enforcement officers experienced in investigating crimes involving the sexual exploitation of children with whom I have had discussions, that  people who have a sexual interest in children, as demonstrated by their accessing of Website A, often possess and maintain images of child pornography to satisfy their sexual interest in children.

D.      COURT AUTHORIZED USE OF THE NETWORK INVESTIGATIVE TECHNIQUE

12.      Based on my training and experience, my review of the VCAC Report, and information related to me by other FBI SAs involved in the investigation, I know the following:

a.      Websites generally have IP address logs that can be used to locate and identify their users.  Consequently, after the seizure of a website whose users were engaging in unlawful activity, law enforcement can normally review the website's IP address logs in order to determine the IP addresses of the users that accessed the website.  A publicly available lookup can generally be performed to determine what ISP owned the target IP addresses, after which a subpoena could be sent to those ISPs to determine the users to which the IP addresses were assigned at a given date and time.

18

Instrumentality Protocol

b.      However, because of the Network software utilized by Website A, any such IP address logs would contain only the IP addresses of the last computer through which the communications of Website A users were routed before the communications reached their destinations.  The last computer, however, would not be the computer of the actual user of Website A who sent the communication or request for information, and it is not possible to trace such communications back through the Network to the actual user.  Thus, Website A's IP address logs could not be used to locate and identify users of Website A.

c.      Accordingly, on February 20, 2015, the same day Website A was seized, the United States District Court for the Eastern District of Virginia authorized a search warrant to allow law enforcement agents to deploy a Network Investigative Technique ("NIT") on Website A in an attempt to identify the actual IP addresses and other identifying information of computers used to access Website A.  Pursuant to that authorization, between February 20, 2015, and approximately March 4, 2015, each time any user or administrator logged into Website A by entering a username and password, the FBI was authorized to deploy the NIT, which would send one or more communications to the user's computer.  Those communications were designed to cause the user's computer to deliver to a computer known to or controlled by the government data that would help identify the user's computer, its location, the user of the computer, and other information about the user's computer, including:  the computer's actual IP address and the date and time that the NIT determined the IP address; a unique identifier generated by the NIT (e.g., a series of numbers, letters, and/or special characters) to distinguish the data from that of other computers; the type of operating system running on the computer, including type (e.g., Windows), version (e.g., Windows 7), and architecture (e.g., x 86); information about whether

19

Instrumentality Protocol

the NIT had already been delivered to the computer; the computer's Host Name; the computer's active operating system username; and the computer's MAC address.

E.    INVESTIGATION REGARDING "QUADRUPLEDOMO"

13.    Based on my training and experience, my review of the VCAC Report, information related to me by other FBI SAs involved in the investigation, and my own investigation, I know the following:

a.    Based on data obtained from the IP address logs of Website A, law enforcement monitoring, and the deployment of a NIT, FBI SAs with VCAC identified a Website A user with the username "quadrupledomo." The profile page of "quadrupledomo" indicated that the user originally registered an account on Website A on September 4, 2014. Profile information on "Website A" could include the user's contact information, other information supplied by the user, and information about the user's participation on Website A, including statistical information about the user's posts to the website and a categorization of those posts. According to "quadrupledomo's" profile, the user was a "Newbie Member" of Website A. Further, according to the "Statistics" section of this user's profile, "quadrupledomo" had been actively logged into Website A for a total of seven hours, six minutes, and 25 seconds, between the dates of September 4, 2014, and February 28, 2015.

b.    In addition, according to the statistics on user "quadrupledomo's" profile page, between September 4, 2014, and February 28, 2015, this user made a total of approximately three postings to Website A. The following is a description of one of these posts:

i.    On October 14, 2014, "quadrupledomo" replied to a post entitled "young teen girl emo forced to suck cock HQ with sound" in the "Girls" forum.

20

Instrumentality Protocol

"quadrupledomo's" reply stated: "Either the password is wrong or the file is corrupt. Is it on Motherless?" The original post contained a hyperlink to an external website containing the full file and a password to open the file. Based on the title of the post and the nature of Website A, it is likely that the file contained child pornography.

      c.    On February 26, 2015, "quadrupledomo," using IP address 104.34.111.20 (the SUSPECT IP ADDRESS), browsed Website A after logging into the website with a username and password. During this session, "quadrupledomo" accessed a post entitled "14yo rachiebabiie with the family dog.avi". The post contained 35 images, the majority of which depicted what appeared to be a minor pubescent girl, naked from the waist down. The majority of the images also depicted a brown dog licking the genital and anal areas of the girl.

      d.    On February 28, 2015, "quadrupledomo" browsed Website A after logging into the website with a username and password. During this session, "quadrupledomo" accessed a post containing a file that contained 25 images. In some of these images, an adult penis partially penetrates the vagina of what appears to be a prepubescent girl. In other images, an adult penis partially penetrates the mouth of what appears to be a prepubescent girl. Also on February 28, 2015, "quadrupledomo" accessed a post containing a file entitled "Ashlylove on younow all.mp3" containing 25 images. The images depicted what appeared to be a partially clothed minor post-pubescent girl. In one of the images, the girl is lying on her back with her legs spread out and exposing her vagina. In other images, the same girl is lying on her back with her legs spread out and holding objects that are penetrating her vagina. In both of the above-described sessions, "quadrupledomo's" IP address information was not collected.

21

                                Instrumentality Protocol

e.      Using publicly available websites, FBI SAs determined that the SUSPECT IP ADDRESS was operated by ISP Time Warner Cable.

f.      In March 2015, an administrative subpoena/summons was served on Time Warner Cable requesting information related to the SUSPECT IP ADDRESS, including subscriber information. On or about June 30, 2015, I reviewed information received from Time Warner Cable regarding the SUSPECT IP ADDRESS. According to Time Warner Cable, from February 25, 2014 to March 3, 2015 -- a time period that includes the day on which the SUSPECT IP ADDRESS was used to access 35 images of what appeared to be child pornography on February 26, 2015 (see paragraph 13(c) above) -- the SUSPECT IP ADDRESS was assigned to Internet subscriber Mohammed Mirza at the SUBJECT PREMISES. Further, according to Time Warner Cable, the Internet service at the SUBJECT PREMISES was activated on December 11, 2014, and was still active as of March 12, 2015.

g.      On or about May 22, 2015, I reviewed a report from the Accurint information database (a public records database that provides names, dates of birth, addresses, associates, telephone numbers, e-mail addresses, etc.) regarding Mohammad Mirza. Accurint indicated that Mirza is a current resident of the SUBJECT PREMISES. Accurint further indicated that Noreen Mirza, Faisal Mirza, and Haris Mirza were other possible residents of the SUBJECT PREMISES. Based on these results, an FBI SA conducted additional searches in Accurint regarding Faisal Mirza and Haris Mirza. Accurint indicated that these individuals also reside at the SUBJECT PREMISES.

h.      On or about May 22, 2015, I searched the California Department of Motor Vehicles ("DMV") database for Mohammad Mirza. The results from the DMV database

22

Instrumentality Protocol

indicated that an individual named "Mohammad Shabbir Mirza" is currently residing at the
SUBJECT PREMISES.

      i.     On or about June 15, 2015, Task Force Officer ("TFO") Sergio Perez and I
conducted a ruse at the SUBJECT PREMISES, wherein we spoke with Mohammed Mirza under
the guise that someone had reported that Mirza's vehicle was involved in a recent hit-and-run
accident. During the conversation, Mirza advised us that he lived at the SUBJECT PREMISES,
along with his wife Noreen Mirza and son Haris Mirza.

      j.     As discussed above, the deployment of the NIT allowed law enforcement
to collect identifying information from a user's computer. With respect to user
"quadrupledomo," law enforcement learned that his/her computer had a hostname of "Noreen"
and a logon name of "N".

## VII.   TRAINING AND EXPERIENCE ON INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN

    14.     As set forth above, there is probable cause to believe that on or about February 26,
2015, an individual at the SUBJECT PREMISES utilized the SUSPECT IP ADDRESS to log
into Website A and access child pornography, and that on or about February 28, 2015, that
individual or someone else at the SUBJECT PREMISES was still accessing child pornography
on Website A. Based on my training and experience, and the training and experience of other
law enforcement officers experienced in investigating crimes involving the sexual exploitation of
children with whom I have had discussions, I have learned that individuals who view multiple
images of child pornography, including on web-based bulletin boards, are often individuals who

23

           Instrumentality Protocol

have a sexual interest in children and in images of children, and that there are certain characteristics common to such individuals:

      a.    Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or in other visual media; or from literature describing such activity.

      b.    Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides, and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

      c.    Individuals who have a sexual interest in children or images of children almost always possess and maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and/or videotapes for many years.

24

                                                      Instrumentality Protocol

d.     Likewise, individuals who have a sexual interest in children or images of children often maintain their collections that are in a digital or electronic format in a safe, secure, and private environment, such as a computer and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence or inside the collector's vehicle, to enable the individual to view the collection, which is valued highly.

e.     Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

f.     Individuals who access hidden and embedded child pornography-related bulletin boards, and other forums such as newsgroups and IRC chatrooms, are typically more experienced child pornography collectors. These individuals likely would have gained knowledge about such forums through online communications with other individuals who have a sexual interest in children or images of children.

g.     Individuals who have a sexual interest in children or images of children prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

h.     Child pornography received via computer is extremely mobile. Through computer technology, digital files are easily reproduced and transported. For example, with the

25

Instrumentality Protocol

click of a button, images and videos containing child pornography can be put onto thumb drives so small that they fit onto a keychain. Just as easily, these files can be copied onto floppy disks or compact disks, and/or stored on iPods, Blackberries, or cellular telephones. Because someone at the SUBJECT PREMISES likely collects and values child pornography, which is easily-stored and duplicated, there is probable cause to believe that evidence of a child pornography collection will be found in the SUBJECT PREMISES.

## VIII.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

15.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.    Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and

26

Instrumentality Protocol

software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.     The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.     Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.

27

Instrumentality Protocol

Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

      e.     Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital devices are, as described further in the attachments, called for by this

28

Instrumentality Protocol

warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f.      Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate

29

Instrumentality Protocol

the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

16.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX. CONCLUSION

17.    For all the reasons described above, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2252A(a)(5)(B) (access with intent to view and possession of child pornography), as described above and in Attachment B to this affidavit, will be found in a search of the SUBJECT PREMISES, which is further described above and in Attachment A to this affidavit.

/s/
_____
TIANA KOSTIC, SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

SUBSCRIBED TO AND SWORN BEFORE ME
ON JULY 10, 2015

JACQUELINE CHOOLJIAN
_____
HONORABLE JACQUELINE CHOOLJIAN
UNITED STATES MAGISTRATE JUDGE

30

Instrumentality Protocol